# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | ) Nos. 10 C 7475 & 10 C 7494 |
| | ) |
| IFC CREDIT, | ) Judge George M. Marovich |
| | ) Appeal from Bankruptcy |
| Debtor. | ) Case No. 09 B 27094 |

## MEMORANDUM OPINION AND ORDER

Appellants Coactiv Capital Partners, Inc. ("Coactiv") and First Chicago Bank and Trust ("First Chicago") filed separate appeals from one decision of the bankruptcy court to enjoin their separate suits against Rudolph Trebels ("Trebels") and Mark Langs ("Langs"). The Court has consolidated the cases. For the reasons set forth below, the decision of the bankruptcy court is affirmed.

### I.     Background

After IFC Credit Corporation ("IFC") filed a chapter 7 bankruptcy petition, Trustee David P. Leibowitz (the "Trustee") filed an adversary proceeding against Trebels and Langs. Trebels founded IFC in 1988 and was the President and CEO until June 2009. Langs began working at IFC in 2003 and served at Chief Financial Officer from March 2006 until June 2009. After filing the adversary proceeding, the Trustee sought and obtained from the bankruptcy court an order enjoining other litigation (four separate lawsuits) filed against Trebels and Langs. Among the four lawsuits enjoined by the bankruptcy court are cases filed by appellants Coactiv and First Chicago.

According to the allegations in the Trustee's adversary complaint, IFC was a general equipment lessor that leased healthcare, industrial and technological equipment to its customers.

The Trustee alleges that, while Trebels and Langs were at the helm of IFC, they caused IFC to enter several misguided and/or fraudulent transactions and that they diverted IFC funds to pay for personal expenses.

The first such transaction began in late 2003 and involved a company called Norvergence. Norvergence planned to sell voice over internet protocol ("VOIP") telecommunications via its "Matrix Box." Norvergence asked IFC to finance the Matrix Box equipment for customers. IFC agreed.

Problems soon arose with the Norvergence transaction. By February 2004, customers who were already being billed by IFC began reporting to IFC that Norvergence had not installed their telephone service. When IFC's Credit Committee (which was charged with using credit underwriting standards to determine whether certain transactions were too risky for IFC to enter or continue) investigated, it learned that the Federal Trade Commission had banned from the telecommunications industry the brother of Norvergence's President due to the fact that the brother had "slammed" customers (i.e., converted their phone service to new carriers without permission). Even as the delinquency rates on Norvergence accounts increased, Trebels caused IFC to increase the number Matrix Boxes it financed. Ultimately, in June 2004, Norvergence filed for bankruptcy protection, and IFC lost more than $15,000,000.00.

Another troubling transaction was IFC's transaction with Wildwood Industries, Inc. ("Wildwood"). In late 2007 or early 2008, IFC began considering a transaction in which it would lease equipment to Wildwood. While conducting due diligence before the transaction, IFC's Credit Committee discovered several facts that suggested Wildwood was operating a fraudulent scheme. The first was that Wildwood continually solicited financing. The second

was that although Wildwood claimed to be one of the largest manufacturers in the Bloomington/Normal area of Illinois, the interest rates it paid were unusual for a manufacturer of its purported size. The third fact was that Wildwood had recorded multiple leases for single pieces of equipment.

Despite the red flags, IFC proceeded with the Wildwood transaction, which turned out to be a Ponzi scheme. Members of IFC's Credit Committee warned Trebels and Langs of the red flags they discovered while doing due diligence, but Trebels and Langs ignored the warnings. In fact, Trebels and Langs decided the Wildwood transaction did not require the approval of the Credit Committee, because Wildwood was a syndicated transaction (one for which IFC would solicit external funding). Trebels and Langs directed IFC employees to solicit financial institutions to finance the lease transactions for Wildwood. They were successful, and other financial institutions, including First Chicago and Coactiv, financed the equipment leases. The equipment, however, did not exist. Wildwood was a Ponzi scheme, and it filed a petition for protection under the Bankruptcy Code. IFC was exposed to $5,000,000.00 in liability for breach of contract with respect to the financial institutions it solicited to finance the Wildwood leases.

The Trustee also alleges that Trebels used IFC to enrich himself to IFC's detriment. The Trustee alleges that Trebels created an entity, R&L holdings, that leased office space to IFC at above-market rates. According to the Trustee's complaint, IFC used Arnstein & Lehr for various legal matters, and Trebels used Arnstein & Lehr for personal matters. Trebels directed Arnstein & Lehr to bill IFC for his personal legal work, and Trebels directed IFC to pay the bills. Trebels also used IFC credit cards to pay for such personal expenses as club memberships, water sports, event tickets, airline tickets for his wife and children, personal cable bills, restaurant meals,

jewelry, golf equipment and charitable donations. IFC paid for most of those credit card purchases. In addition, Trebels put his wife and two sons on IFC's payroll for two years, during which they performed little or no work.

Based on these allegations, the Trustee asserts claims against Trebels and Langs for breach of fiduciary duty and unjust enrichment. The Trustee, however, is not the only entity to have filed suit against Trebels and Langs. First Chicago and Coactiv also filed separate suits against Trebels and Langs.

Coactiv filed suit in June 2010 against Trebels, Langs, Lee Trebels ("Mrs. Trebels") and IFC Capital Funding I, LLC ("IFC"). IFC is an entity apparently created to buy some of IFC's leases from IFC. Coactiv's suit arose out of several transactions Coactiv entered into with IFC and IFC-related entities.

The first relevant transaction between Coactiv and IFC occurred in 2007. Coactiv agreed to purchase leases from IFC, and IFC agreed to service the leases. Separately, Coactiv loaned $25,000,000.00 to IFCI so that IFCI could purchases leases from IFC. Under each of these agreements, IFC was required to direct all of the relevant lease payments to a lockbox account under Coactiv's control and to provide Coactiv monthly reports about the lease payments. According to Coactiv, IFC breached these and related agreements in a number of ways, including by failing to report to Coactiv when leases went into default. By early 2009, IFC owed Coactiv more than $2,000,000.00 under the agreements. Coactiv and IFC agreed to a payment plan of $50,000.00 plus weekly payments of $25,000.00, for which Trebels signed a guaranty. IFC made the payments from March 31, 2009 until June 10, 2009 and then stopped paying.

Separately, in March 2008, Coactiv agreed to enter an agreement with IFC that involved Wildwood. Specifically, Coactiv agreed to purchase IFC's interest in rental payments owed to IFC under a lease between IFC and Wildwood. IFC represented to Coactiv that IFC had good title to the equipment and leases and that the equipment had been delivered to Wildwood. In reality, Wildwood never received the equipment and was, in fact, a Ponzi scheme. Coactiv lost $2,500,000.00.

Coactiv alleges Trebels used the funds that should have been directed to IFC for personal expenses, including personal legal bills, club memberships and cars for his children. Coactiv also alleges that Trebels used IFC funds that should have been directed to Coactiv to put his children and wife on the IFC payroll, despite the fact that they performed no work.

Like Coactiv, First Chicago filed suit against Trebels and Langs. First Chicago also named Mrs. Trebels as a defendant. First Chicago's claims arise out of two schemes to defraud First Chicago.

First, in or about December 2007, IFC borrowed $10,000,000.00 from First Chicago. That loan was supposed to be used exclusively to purchase equipment that IFC was to lease to third parties. Instead, Trebels and Langs had IFC cut checks (in amounts totaling more than $3,000,000.00) to vendors–so that it would look like IFC was paying vendors–but IFC failed to send the checks to the vendors. IFC was dishonest in other ways. The First Chicago loan required IFC to send to First Chicago any amounts First Chicago received as early payoffs of leases. Instead, IFC solicited customers to make discounted payments to terminate leases and then kept the money rather than paying it to First Chicago. Another problem with respect to the

loan was that Trebels and Langs, instead of keeping the leases in a separate, locked file, double-pledged the leases.

The second scheme First Chicago complains about in its complaint against Trebels and Langs is the Wildwood scheme. In June 2008, First Chicago paid more than $2,850,000.00 to purchase IFC's title to and interest in rental payments owed to IFC under IFC's lease with Wildwood. Wildwood was a Ponzi scheme. Like the Trustee and Coactiv, First Chicago alleges that Trebels and Langs knew or should have known that Wildwood was a Ponzi scheme.

First Chicago alleges that Trebels and Langs diverted funds belonging to First Chicago to their personal benefit. Specifically, First Chicago claims that Trebels and Langs used First Chicago's money to pay for cars for their children, personal legal expenses and club memberships. In addition, First Chicago claims that IFC used First Chicago's money to put Mrs. Trebels and the Trebels' children on the IFC payroll, despite that fact that none actually performed work.

After IFC filed for bankruptcy protection, the bankruptcy court issued an injunction pursuant to its "related to" jurisdiction. When it enjoined Coactiv's and First Chicago's suits against Trebels and Langs, the bankruptcy court noted that the injunction was necessitated by "[t]he Bankruptcy Code's core goals of *pro rata* distribution and orderly administration of a bankruptcy estate." (9/28/10 Order at 6). The bankruptcy court explained that there was substantial overlap between the suits and that "[a]llowing the lawsuits to continue would diminish the amount of funds payable to the bankruptcy estate for pro rata distribution to all creditors." *Id.*

Coactiv and First Chicago seek reversal of the bankruptcy court's injunction.

## II.     Standard of review

The Court reviews the bankruptcy court's determinations of law *de novo* and its determinations of fact for clear error. *In re Smith*, 582 F.3d 767, 777 (7th Cir. 2009).

## III.    Discussion

The parties assert that the Court has jurisdiction to review the order of the bankruptcy court under 28 U.S.C. § 158(a), which grants the district courts jurisdiction to hear appeals "from final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a). The Court is not so sure. Although finality is interpreted more "liberally" under § 158 than it is under §1291, the interlocutory orders that are considered final in this circuit are "those orders that ultimately determine a creditor's position in the bankruptcy proceeding, even though administration of the debtor's estate continues." *In re: Forty-Eight Insulations Inc.*, 115 F.3d 1294, 1299 (7th Cir. 1997). That is not the case here. Still, the Court need not determine whether the order in this case could be considered a final order, because the Court is granted discretion to consider appeals of interlocutory orders. 28 U.S.C. § 158(3); *In re Teknek, LLC*, Case No. 07 C 5229, 2007 WL 4557813 at *5 (N.D. Ill. Dec. 21, 2007) (agreeing to review preliminary injunction order issued by bankruptcy court), *aff'd* 563 F.3d 639 (7th Cir. 2009). The Court will exercise its discretion here.

### A.     Bankruptcy is not void *ab initio*

As a threshold matter, First Chicago argues that the entire bankruptcy is void *ab initio*, because the initial petition was not signed by an attorney. The parties agree that when IFC filed its Chapter 7 bankruptcy petition on July 27, 2009, it was signed by IFC's President, who is not

an attorney. Although individuals can proceed *pro se* in bankruptcy, corporations may appear in federal court only through a licensed attorney. *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-202 (1993) ("It has been the law for the better part of two centuries, for example, that a corporation may appear in the federal courts only through licensed counsel."). First Chicago called the problem to IFC's attention, and, on July 28, 2009 (the day after IFC filed the original petition), IFC filed an amended petition that was signed by an attorney.

When First Chicago sought to have the bankruptcy dismissed as void *ab initio*, the bankruptcy court declined, reasoning that Rule 9011(a) of the Bankruptcy Rules allows a party to correct the omission of a signature and that Rule 1009 provides a general right to amend.

This Court agrees. Bankruptcy Rule 1009 states that "[a] voluntary petition . . . may be amended by the debtor as a matter of course at any time before the case is closed." Accordingly, IFC had a right to amend its petition to correct the signature error. Furthermore, Bankruptcy Rule 9011(a) provides:

> Every petition . . . shall be signed by at least one attorney of record in the attorney's individual name. . . . An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

Bankruptcy Rule 9011(a). Thus, the plain language of the Rule allowed IFC to correct the omission of the attorney signature when First Chicago pointed out the omission. *In re IFC Credit*, Case No. 10 C 256, 2010 WL 1337412 at *3 (N.D. Ill. March 31, 2010) ("First Chicago argues at length that a Chapter 7 bankruptcy petition filed by a corporate debtor proceeding pro se is void ab initio regardless of what happens afterwards. . . . The problem with this argument is that, as the bankruptcy court recognized, Fed.R.Bankr.P. 9011(a) and 1009(a) expressly

authorize a debtor to promptly amend a technical deficiency in the verification of an initial petition.").

Federal District Courts have a similar rule (Fed.R.Civ.P. 11(a)) and regularly allow parties time to find counsel to correct the omission of an attorney's signature on a complaint. *Moorish Nat'l Republic v. City of Chi.*, Case No. 10-cv-1047, 2011 WL 2893024 at *3 (N.D. Ill. July 19, 2011) (dismissing claims of *pro se* entities after having given those entities about nine months to find counsel). Under Rule 11(a), unsigned pleadings, once corrected, are stricken only if the moving party is severely prejudiced, which First Chicago does not claim to have been (nor could it given that IFC would simply have filed a new bankruptcy petition instead of amending the first one). *United States v. Kasuboski*, 834 F.2d 1345, 1348 (7th Cir. 1987); *Operating Engineers Local 139 Benefit Fund v. Rawson Plumbing, Inc.*, 130 F. Supp.2d 1022, 1024 (E.D. Wis. 2001) (a court strikes pleadings under Rule 11(a) "only if the moving party has somehow been severely prejudiced or misled by the defective papers.").

The Court is unpersuaded by First Chicago's state-law procedural argument. First Chicago relies heavily on Illinois state-court precedents for the proposition that a complaint signed by a layperson (instead of a lawyer) is void *ab initio*. This federal court, however, applies federal procedural rules, not state-law procedural precedents. *Christensen v. County of Boone*, 483 F.3d 454, 465 (7th Cir. 2007) ("Yet this suit is in federal rather than state court, and each sovereign may apply its own procedural rules in its own courts." ). Those federal procedural rules allowed IFC to correct the omission of the signature. Accordingly, the Court rejects First Chicago's threshold argument.

## B. Legality of the injunction order

A bankruptcy court's jurisdiction extends to "civil proceedings arising under title 11, or arising in or *related to cases* under title 11." 28 U.S.C. § 1334(b) (emphasis added). Although "Congress did not delineate the scope of 'related to' jurisdiction, . . . its choice of words suggests a grant of some breadth." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-308 (1995).

A bankruptcy trustee "may temporarily block adjudication of claims that are not property of the estate by petitioning the bankruptcy court to enjoin the other litigation, if it is sufficiently 'related to' her own work on behalf of the estate." *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (citing 18 U.S.C. § 1334(b)). This power to enjoin other litigation applies "beyond claims by and against the debtor, to include 'suits to which the debtor need not be a party but which may affect the amount of property in the bankruptcy estate,' or 'the allocation of property among creditors.'" *Fisher*, 155 F.3d at 882 (internal citations omitted). The question to be considered is whether "the claims of the debtor . . . and the claims of the creditors . . . against third parties are so closely related that allowing the creditors to convert the bankruptcy proceeding into a race to the courthouse would derail the bankruptcy proceedings." *Fisher*, 155 F.3d at 883.

Here, the Court concludes that the Trustee's claims against third parties Trebels and Langs are so closely related to Coactiv's and First Chicago's claims that allowing the creditors to race to the courthouse would derail the bankruptcy proceedings. To be sure, the cases are not identical. Coactiv and First Chicago name additional parties (both name Mrs. Trebels and Coactiv names IFC) that are not named by the Trustee. In addition, Coactiv and First Chicago

have some claims against Trebels and Langs that do not overlap with the Trustee's claims. Those claims arise out of loans Coactiv and First Chicago made to IFC.

The issue, though, is not whether the suits are identical but whether the suits are "related." 28 U.S.C. § 1334(b). The Court concludes that they are. In each of the three suits, the plaintiff alleges that Trebels and Langs diverted funds belonging to plaintiff to pay for Trebels' legal bills, club memberships, cars and to put Trebels' wife and children on the IFC payroll. Thus, all three plaintiffs are trying to disgorge the same funds from Trebels and Langs. In addition, each plaintiff asserts claims arising out of the Wildwood Ponzi scheme. Those claims are related in that they allege the same wrongdoing by the same parties. The Court agrees with the bankruptcy court's conclusion that allowing Coactiv and First Chicago to pursue their claims before the Trustee is allowed to pursue his would affect the amount of funds available for pro rata distribution to all creditors.

## IV. Conclusion

For the reasons set forth above, the Court affirms the decision of the bankruptcy court.

ENTER:

George M. Marovich
United States District Judge

DATED: September 14, 2011